IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 15, 2025

## RODNEY MILLER v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
No. 17-04927    Carlyn L. Addison, Judge

_____

## No. W2024-01221-CCA-R3-PC

_____

The Petitioner, Rodney Miller, appeals from the order of the Shelby County Criminal Court denying his petition seeking post-conviction relief from his convictions of rape of a child, aggravated statutory rape, and aggravated sexual battery. On appeal, the Petitioner initially argues that the order of the post-conviction court is insufficient for appellate review. He further claims that each of his trial counsel provided ineffective assistance in failing to object to the State's improper voir dire, in failing to effectively cross-examine the victim at trial, and in failing to adequately advise the Petitioner of his right to testify. Finally, the Petitioner asserts that the cumulative effect of trial counsels' deficiencies deprived him of his right to a fair trial.[1] After review, we affirm the judgment of the post-conviction court.

**Tenn R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, P.J. and J. ROSS DYER, J., joined.

W. Price Rudolph, Memphis, Tennessee, for the Petitioner, Rodney Miller.

Jonathan Skrmetti, Attorney General and Reporter; J. Katie Neff, Assistant Attorney General; Steve Mulroy, District Attorney General; and Regina Lucreziano, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The facts underlying the Petitioner's convictions are outlined in detail in this court's opinion from the Petitioner's direct appeal. State v. Miller, No. W2019-00080-CCA-R3-

---

[1] The Petitioner raised additional issues in his petition and during the evidentiary hearing in this case. However, he does not advance those issues in this appeal; accordingly, they are waived.

CD, 2020 WL 3443021 (Tenn. Crim. App. June 17, 2020), perm. app. denied (Tenn. Oct. 12, 2020). As relevant to the issues raised in this appeal, the evidence at trial established that the victim had known the Petitioner for her entire life. The Petitioner's brother had been "involved" with the victim's grandmother, and the Petitioner had helped the victim's family while her mother was undergoing cancer treatment. The victim and her siblings referred to the Petitioner as "Uncle Rodney." The victim was fourteen at the time of the Petitioner's trial, and she testified that the first time that the Petitioner "touched her vagina" was in the summer of 2015, when she was eleven years old, in his house, in the bedroom. Id. She said the touching continued until the summer of 2016, when the Petitioner asked her to have sex with him. She did not know the number of times that the Petitioner touched her because there were so many. The victim testified that she and the Petitioner had sex in various places. Id.

The victim said that the Petitioner last had sex with her on December 3, 2016. Miller, 2020 WL 3443021, at *1. The victim recalled that she and the Petitioner were on the floor in her bedroom, and her twin siblings were in the victim's bed, asleep. The victim said that she and the Petitioner had sex on her bedroom floor, and the Petitioner was wearing a condom. She then went to sleep. The victim testified that the following morning, the Petitioner sent her a text that read: "Did you find the condom wrapper, and I jacked off on your breasts." The Petitioner also said that he had the victim's blue Calvin Klein panties. The victim testified that the Petitioner had sent her text messages on other occasions about sexual things that he did to her. The victim recalled that on one occasion, she was at the Petitioner's house in the office with him. The door was closed, and the Petitioner had his pants unzipped, and he placed his finger in the victim's vagina. The victim's sister walked in and saw what was happening. The victim could not recall the date that this occurred. Id.

On December 16, 2016, the victim inadvertently left her phone at home when she went to school, and her mother saw text messages from the Petitioner. Her mother asked her about the messages in the car after she picked up the victim from school. The victim testified that she told her mother what happened, and her mother called the police. The victim spoke with the police and then went for a medical examination. Miller, 2020 WL 3443021, at *2. In December 2016, Lolita Rosser of the Memphis Police Department was assigned to the internet crimes against children unit. She was given the victim's cell phone to extract information. Officer Rosser was able to extract communications between the victim and the Petitioner from the phone. She extracted both deleted and active text messages, videos, photographs, and anything associated with the Petitioner's name or cell phone number. The deleted text messages, outgoing and incoming text messages, and photographs between the Petitioner and the victim were introduced at trial. Id. at *2. The following text messages, taken from our direct appeal, provided:

On October 17, 2016, [the Petitioner] sent the victim a text which read: "I seen everybody but you today not cool." To which the victim responded: "My day was good I'm about to take a bath and go to sleep to[o]." [The Petitioner] then asked the victim to send him a picture, and he texted: "You knew I was going to say that" and "I like it." On the night of November 6, 2016, [the Petitioner] texted the victim and asked her to "take a picture now." He further texted: "I love it" and "Goodnight love." The following night on November 7, 2016, [the Petitioner] texted "[u]nderwear pic" to the victim and asked, "What u have on." He later texted, "Good night love." On the night of November 10, 2016, [the Petitioner] texted the victim the following: "He's standing up tall looking for you," and "I need some pictures to look at." [The Petitioner] further texted, "I need a picture of that monkey," and "Down there by them thighs." He also sent, "I love you."

After midnight on November 13, 2016, [the Petitioner] sent the following text to the victim: "Shouldn't let me hit a little bit," and "Just for a few minutes [while] was upstairs." He also sent: "My dick is so hard." [The Petitioner] later texted the victim and said, "Take picture" and "Show me the wet p." On November 14, 2016, [the Petitioner] texted the victim: "I am about to tell your mom what we got going on what you think," and "Love with u." On December 4, 2016, [the Petitioner] texted: "Hello, sexy." [The Petitioner] and victim also exchanged the following texts:
[Petitioner]: I got something of yours[:] it's in my bag and smells so good[.] LiteBlue Calvin Klein p[anties]
[The victim]: Why do u have those
[Petitioner]: I don't know
[The victim]: Yes u do
[Petitioner]: Dressed in the dark
[Petitioner]: Did you find a condom
[The victim]: No
[The victim]: I thought u found it
[Petitioner]: The [w]rapper
[The victim]: U don't [know] where the condom is
[The victim]: I will run across it
[The victim]: For some reason I'm hurting
[Petitioner]: Where at
[The victim]: P
[Petitioner]: Only put it in one time
[The victim]: I know but it's still hurting[.] I don't know why[,] but its irritated
[Petitioner]: Have you take[n] a bath

[The victim]: Yes
[Petitioner]: I will be f [ ]ckin' in the bed from now on[,] no floor
[The victim]: K maybe that's it
On December 14, 2016, [the Petitioner] texted the victim: "Next time you come[,] spend the night sleeping in the bed with me."

Miller, 2020 WL 3443021, at *2-3.

The victim's sister testified at trial that on one occasion in the summer of 2016, she saw the victim and the Petitioner in the office together. Miller, 2020 WL 3443021, at *3. The Petitioner's pants were unzipped, and he touched the victim's "butt." The Petitioner then told the victim's sister that "[n]othing happened." The victim's sister did not tell anyone what she saw because she was afraid. Id.

Based in large part upon the above evidence, the Petitioner was subsequently convicted of rape of a child, aggravated statutory rape, and aggravated sexual battery. The trial court imposed a sentence of thirty-six years for rape of a child, four years for aggravated statutory rape, and ten years for aggravated sexual battery to be served consecutively in confinement. Miller, 2020 WL 3443021, at *1. In his direct appeal, the Petitioner raised the following issues: (1) whether the evidence was sufficient to support his conviction for rape of a child; (2) whether the trial court properly admitted the victim's medical history provided during her SANE examination; (3) whether the trial court properly denied the Petitioner's motion for a bill of particulars; (4) whether the trial court erred by failing to merge the Petitioner's conviction for aggravated sexual battery into his conviction for rape of a child; (5) whether the trial court erred by ordering consecutive sentences; and (6) cumulative error. This court affirmed the judgments of the trial court, and the supreme court denied discretionary review on October 12, 2020.

On October 8, 2021, the Petitioner filed a timely petition for post-conviction relief. In the petition, the Petitioner alleged that trial counsel rendered ineffective assistance by failing to conduct a minimally adequate investigation, by failing to call necessary witnesses at trial, and by failing to explain the right to testify and strongly encourage the Petitioner to testify, and that the cumulative effect of these errors warranted post-conviction relief. On October 15, 2021, the State filed its response, denying the allegations in the petition. On April 22, 2024, the Petitioner filed an amended petition for post-conviction relief, asserting that second trial counsel was ineffective in failing to object to the State's improper voir dire in the motion for new trial. He asserted that first counsel was ineffective in failing to effectively cross-examine Officer Lolita Rosser at trial, in failing to effectively cross-examine the victim at trial, and in failing to explain the right to testify to the Petitioner. The Petitioner further alleged that the cumulative effect of trial counsels' alleged deficiencies entitled him to relief.

- 4 -

On July 22, 2024, the Petitioner filed a second amended petition, alleging that trial counsel was ineffective in failing to raise the issue of the victim's medical history obtained during the SANE examination in the motion for new trial. The Petitioner also asserted that appellate counsel was ineffective in failing to provide sufficient case law or legal bases to support arguments regarding the Rule 803 issue and SANE issue.

On July 24, 2025, the post-conviction court held an evidentiary hearing. First counsel and second counsel testified at the hearing. First counsel testified that he worked for second counsel, but he represented the Petitioner as lead attorney at trial. At the time of trial, he had been practicing for two years and was a licensed attorney in the State of Tennessee. First counsel was trial counsel in a jury trial in a rape of a child case immediately before the Petitioner's case. He explained that his license had since been suspended because he had taken on too many cases and had become overextended.

First counsel worked on the Petitioner's case for approximately six months to a year before trial and met with the Petitioner about four or five times during that period. First counsel hired an investigator from Inquisitor, Inc., who worked on the case for several months. Because the case involved a time frame with offenses that extended over a year and was based on the memory of a young victim, first counsel's trial strategy was to challenge the reliability of the victim's memory. First counsel recalled that the victim could remember that sexual conduct had occurred, but she could not remember the dates the sex acts had occurred. First counsel said the investigator spoke with all the witnesses who were willing to speak with her, including the victim's family. However, the investigator was unable to find any useful information to serve as impeachment material. First counsel testified that he communicated clearly about the "biggest issues" of the case and that he and the Petitioner "generally saw eye to eye on how things should progress." He further stated that the Petitioner did not voice any concerns or make any requests about what was to be done at trial.

Upon being shown a copy of the preliminary hearing transcript of the victim's testimony, first counsel agreed that the victim said the last time she had sex with the Petitioner was on December 3, 2016. First counsel could not recall whether he provided the Petitioner with a physical copy of discovery; however, he went through the discovery "page by page" with the Petitioner and explained which parts were essential to the case. He agreed that he explained all the charges to the Petitioner. First counsel recalled receiving a large, 320-page text message packet of phone records from the State. He reviewed the discovery and cell phone records in preparation for the victim's cross-examination. Before trial, first counsel reviewed the text messages with the Petitioner. First counsel observed that some of the text messages were "very prejudicial" to the Petitioner. First counsel said the Petitioner had an explanation for the prejudicial text

messages; however, first counsel did not believe the Petitioner's explanations would have been convincing to a jury. First counsel attempted to present a plausible or "alternative understanding" of what the text messages meant. First counsel stated that the Petitioner was familiar with the "less prejudicial" text messages, and first counsel had no reason to believe the text messages had been "doctored" in any way. First counsel said that the Petitioner never claimed that anyone other than jail authorities had custody and control of his phone. In other words, neither the victim nor her sister had access to his phone, and they were unable to get into it. First counsel never obtained a court order for the Petitioner's phone from jail authorities, and he did not conduct an independent forensic analysis of it.

Upon being shown the portion of the victim's trial testimony that her "mother woke up to a text message that said did you find the condom wrapper, and I jacked off on your breasts," first counsel agreed there was no objection to hearsay. First counsel explained that the text may have already been in evidence or was about to be admitted into evidence, regardless of any objection. First counsel did not remember whether he found a text message sent from the Petitioner stating that he "jacked off on [the victim's breasts]" when he reviewed the cell phone information in discovery. First counsel explained that the victim "rephrase[d]" the text, and she continued to testify that the Petitioner told her he had her blue Calvin Klein panties, and she was trying to figure out why.

After the jury was selected, first counsel was given information from one of the Petitioner's family members that the Petitioner had a "micropenis" or an extremely tiny penis. The Petitioner's family member advised first counsel that the Petitioner's penis had a distinctive shape and that it was unlikely the Petitioner was capable of penetration. Although first counsel attempted to challenge the victim's memory with this information, the State objected, and the trial court agreed that this line of questioning was impermissible. First counsel nevertheless believed he impeached the victim's credibility, in part, with this information because she drew a picture of a penis that was much larger than a micropenis. First counsel agreed, however, that he was unable to convince the court to allow the admission of a photograph of the Petitioner's penis, and that neither a family member nor the Petitioner testified regarding the condition of his penis. First counsel also agreed that the trial court's "comments and conditions and demeanor . . . had a chilling effect on how he was going to proceed."

First counsel said that second counsel handled the voir dire portion of the Petitioner's trial. First counsel recalled the State posing a question during voir dire concerning whether the State or a defendant chooses a victim in a case. First counsel said the question was "a pretty classic line by the State," and he was uncertain whether the question was objectionable. First counsel said that second counsel "raised the objection," but first counsel did not believe it was necessary. Post-conviction counsel asked first

counsel to review the trial transcript of the voir dire to determine whether second counsel had in fact objected to the State's question. In response, first counsel said that second counsel was "a little bit harder to understand on a transcript than he is in real life."

In any case, first counsel read a portion of the voir dire transcript handed to him by post-conviction counsel, which provided:

> [STATE]: All right. Okay. That's a little bit of a trick question, but not really. Let's see, [prospective juror], does the State pick the witnesses to a crime?- me?
> [PROSPECTIVE JUROR]: No.
> [STATE]: Who does?
> [PROSPECTIVE JUROR]: The people that called the police.
> [STATE]: The people who called the police. Okay. Well, does it make sense that the person who commits the crime is the person who picks the witnesses? -- the person who robbed the bank is the person who decides whether to rob it a 2:00 o'clock in the afternoon when the bank is full of people or 2:00 o'clock in the morning when nobody is looking? Does that make sense?
> . . . .
> [STATE]: Okay. I'm not asking about the defendant in a criminal case, exactly. What I'm asking is somebody who is committing a crime – who is deciding to rob a bank, for example, they make decisions about what they do that affect whether or not there are witnesses or who those witnesses are. Does that make sense?
> . . . .
> [STATE]: So, just like I said, they decide when they're sitting in their, you know, house, trying to decide how they're going to go about robbing this bank whether --
> [SECOND COUNSEL]: I don't want to beat a dead horse, but could we approach the bench just for a second.
> [THE COURT]: All right.
>                    (Bench Conference commenced).
> [SECOND COUNSEL]: That's the basis of my previous objection. What she is trying to say is, in this case, that the person –that this crime was committed in broad daylight where there's a witness or anything like that. That's going to be – that's their theory of the case. And they're trying to put –to ask this juror to make a decision about the next set of questions-- "Well, if it develops, in this case, that the defendant –that this was committed, you know, in secret, could you, you know, take that into consideration?"
> . . .

- 7 -

[STATE]: I'm strictly going to ask them to take that into consideration – to use their common sense.

[THE COURT]: [Second counsel], I think generally I give pretty good leeway in the types of questions that are asked as long as she stays away from the particular facts in this case. What she is trying to point out is something that they can use their common sense on. She's not using the facts of this case. She's trying to make a point that I think is a valid one. So long as she doesn't elicit a promise from them, or as long as she doesn't use the facts of this case, this line of questions is pretty common and admissible.

. . .

[SECOND COUNSEL]: Very well . . . .

Upon reviewing the above exchange, first counsel maintained that second counsel had objected to the State's line of questioning based on second counsel's statement that it "was the basis of [his] previous objection." First counsel explained, "[T]aken in context with whatever is before [the portion of the transcript that was provided], which I don't have in front of me, I think that might be enough to be [] considered a full objection." Post-conviction counsel noted that the above portion of the transcript was attached to the amended petition; however, he moved it into evidence at the hearing. At this point, the post-conviction court asked, "You don't have more of a transcript than this right now?" Post-conviction counsel replied that he had the entire voir dire transcript, but he did not want "to crack that open." Post-conviction counsel advised the court, "I think we've answered this question."

First counsel explained that before advising the Petitioner regarding testifying at trial, he asked the Petitioner what he would say. From that conversation, first counsel learned that the Petitioner did not have "really great answers" to questions that would likely be asked on cross-examination by the State. First counsel also said the Petitioner did not have a "strong position" about testifying at trial. Although the Petitioner initially wanted to testify, they never reached a point in their preparation where they put together testimony that would help the Petitioner rather than hurt him. First counsel stated that there was a Momon hearing at trial during which the trial court advised the Petitioner of his right to testify, and the Petitioner elected not to testify. First counsel testified that he also advised the Petitioner of his right to testify; however, based on their discussions, he advised the Petitioner against doing so. First counsel nevertheless told the Petitioner, "No matter what[,] it's absolutely your right to testify."

On cross-examination, first counsel clarified that the victim's drawing of the Petitioner's penis was of two lines that were approximately eight to ten inches in length. First counsel said the drawing focused more on the length of the Petitioner's penis.

Second counsel testified that he did not recognize the Petitioner, and he had no independent recollection, aside from reviewing the record, of ever representing the Petitioner. He testified he was 85 years old and had been practicing law since 1963.

The Petitioner testified that he met with first counsel "two days before trial" and that second counsel came to visit him once while he was incarcerated. He said that he did not receive a written copy of the discovery. He testified that first counsel did not discuss any trial strategy with him and that he never reviewed the discovery until trial. However, when asked what trial counsel did to prepare him for trial, he responded, "They showed me stuff from the discovery pack." The Petitioner also said the first time he saw the text message package was at trial. Post conviction counsel asked the Petitioner if trial counsel told him he had a right to testify, and the Petitioner replied, "Yes." The Petitioner testified that trial counsel told him, "it was up to me and whatever I wanted to do" and that he decided not to testify. Asked the basis of that decision, the Petitioner said, "We went to trial, and I—we didn't—I didn't say anything. I ain't have nothin' [sic] to say. I just told them to prove it."

The Petitioner stated that if he had testified at trial, he would have asserted that the victim and her sister were lying. He also would have stated that the victim and her sister used his phone regularly when he laid it down, and that they had access to use his phone.

At the conclusion of the evidentiary hearing, the post-conviction court addressed each issue raised by the Petitioner and denied relief. The court found that the Petitioner's testimony was not credible. The court also found the proof presented at the hearing, which included an incomplete record of the trial transcript, did not clearly establish the Petitioner's claim that second counsel was ineffective in failing to object during the State's voir dire. The court observed, "As far as whatever objection he made or did not make, it was not preserved for the record." As to the Petitioner's claim that counsel failed to properly advise him of his right to testify, the post-conviction court found that the Petitioner's own testimony at the hearing demonstrated that trial counsel discussed with him the right to testify. The court specifically found, "[The Petitioner] said very clearly, they talked to me about testifying. I knew I could testify[,] and I had the right to remain silent, and I decided not to."

Next, the post-conviction court found that the Petitioner failed to prove that trial counsel's cross-examination of the victim was deficient. The court specifically highlighted the absence of evidence regarding a supposedly missing text message that the Petitioner argued could be used to impeach the victim. The court further determined that the Petitioner's claim, that the victim or her siblings sent the sexually explicit text messages

- 9 -

from the Petitioner's phone, was not credible because the victim and her siblings were children at the time. Finally, the court found that no cumulative error existed.

On July 25, 2024, the trial judge denied the petition by written order, which included:

> [T]he Petitioner failed to meet the statutory burden of proving, by clear and convincing evidence the factual allegations set forth in three of his petitions. After a full hearing on the merits of his petitions, this Court does not believe that [the Petitioner] testified credibly about any of the 17 grounds he raised relating to deficient performance of trial counsels. Further, the Petitioner was unable to provide any of the witnesses he claimed would have changed the outcome of the jury verdict. In fact, [the Petitioner] testified that he never shared the detailed witness list with his trial counsel. The Petitions filed in his matter and his prayer for relief are Denied.

It is from this order that the Petitioner now appeals.

## ANALYSIS

The Petitioner claims the post-conviction court erred in denying his petition for relief. Initially, he claims that the post-conviction court's written order is insufficient for appellate review. The State contends that the written order and the post-conviction court's oral findings are sufficient for appellate review. The Petitioner next argues that he received ineffective assistance of counsel based on the following four grounds: (1) trial counsel's failure to object to the State's improper voir dire; (2) trial counsel's failure to effectively cross-examine the victim at trial; (3) trial counsel's failure to adequately advise the Petitioner on his right to testify; and (4) the cumulative effect of trial counsels' deficiencies deprived him of his right to a fair trial. We will address each issue in turn.

A post-conviction court is required to set forth in its written order "all grounds presented" and "state the findings of fact and conclusions of law with regard to each ground." Tenn. Code Ann. § 40-30-111(b). While this provision has been construed as mandatory, a post-conviction court's failure to fully comply does not necessitate reversal since the primary intent of the requirement is to facilitate appellate review. See State v. Swanson, 680 S.W.2d 487, 489 (Tenn. Crim. App. 1984); see also Pruitt v. State, No. W2019-00973-CCA-R3-PD, 2022 WL 1439977, at *82 (Tenn. Crim. App. May 6, 2022)

(concluding that the testimony presented at the post-conviction hearing and the post-conviction court's "general denial of the petition" created a record "sufficient for meaningful appellate review"); Welden v. State, No. E2021-00772-CCA-R3-PC, 2022 WL 1815476, at *4 (Tenn. Crim. App. June 3, 2022).

Although the post-conviction court's written order in this case was brief, that alone is not grounds for reversal so long as the record permits meaningful appellate review. While the better practice is to explicitly comply with the statutory requirements in a written order, the post-conviction court made oral findings of fact and conclusions of law spanning sixteen pages in the post-conviction hearing transcript. Given the post-conviction court's extensive findings of fact and conclusions of law as to all grounds presented at the conclusion of the hearing and its denial of the petition in a written order, we conclude that the record is sufficient for meaningful appellate review of the Petitioner's claims.

We will now address the Petitioner's ineffective assistance of counsel claims based on the following well-established legal framework. Post-conviction relief is only warranted when a petitioner establishes that his or her conviction or sentence is void or voidable because of an abridgement of a constitutional right. Tenn. Code Ann. § 40-30-103. A post-conviction petitioner has the burden of proving the factual allegations by clear and convincing evidence. Id. § 40-30-110(f); see Tenn. Sup. Ct. R. 28, § 8(D)(1); Nesbit v. State, 452 S.W.3d 779, 786 (Tenn. 2014). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Lane v. State, 316 S.W.3d 555, 562 (Tenn. 2010); Grindstaff v. State, 297 S.W.3d 208, 216 (Tenn. 2009); Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

This court reviews "a post-conviction court's conclusions of law, decisions involving mixed questions of law and fact, and its application of law to its factual findings de novo without a presumption of correctness." Whitehead v. State, 402 S.W.3d 615, 621 (Tenn. 2013) (citing Felts v. State, 354 S.W.3d 266, 276 (Tenn. 2011); Calvert v. State, 342 S.W.3d 477, 485 (Tenn. 2011)). However, a post-conviction court's findings of fact are conclusive on appeal unless the evidence in the record preponderates against them. Tenn. R. App. P. 13(d); Calvert, 342 S.W.3d at 485 (citing Grindstaff, 297 S.W.3d at 216; State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999)). "Accordingly, appellate courts are not free to re-weigh or re-evaluate the evidence, nor are they free to substitute their own inferences for those drawn by the post-conviction court." Whitehead, 402 S.W.3d at 621 (citing State v. Honeycutt, 54 S.W.3d 762, 766 (Tenn. 2001)). "As a general matter, appellate courts must defer to a post-conviction court's findings with regard to witness

credibility, the weight and value of witness testimony, and the resolution of factual issues presented by the evidence." Id. (citing Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999)).

A claim for post-conviction relief based on alleged ineffective assistance of counsel presents mixed questions of law and fact. Mobley v. State, 397 S.W.3d 70, 80 (Tenn. 2013) (citing Calvert, 342 S.W.3d at 485). The right to effective assistance of counsel is protected by both the United States Constitution and the Tennessee Constitution. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. To prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) this deficient performance prejudiced the defense. Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996); Strickland v. Washington, 466 U.S. 668, 687 (1984).

A petitioner successfully demonstrates deficient performance when the petitioner establishes that his attorney's conduct fell "below an objective standard of reasonableness under prevailing professional norms." Goad, 938 S.W.2d at 369 (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at 370 (quoting Strickland, 466 U.S. at 694). "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Id.

The Petitioner contends that he received ineffective assistance of counsel based on trial counsel's alleged failure to object to a line of questioning by the State during voir dire, arguing that such failure "undermined the presumption of innocence" afforded to the Petitioner. Specifically, the Petitioner objects to the following question: "Does the State pick the witnesses to the crime?" The State responds that the Petitioner failed to prove his claim at the post-conviction hearing and failed to provide a sufficient record for review of this issue. While we agree that the Petitioner failed to provide the post-conviction court with the complete voir dire transcript, this court may take judicial notice of the record of the Petitioner's direct appeal. See McCracken v. State, 529 S.W.2d 724, 726 (Tenn. Crim. App. 1975) (citing State ex rel. Brown v. Newell, 391 S.W.2d 667, 669 (Tenn. 1965); Canupp v. State, 460 S.W.2d 382, 383 (Tenn. Crim. App. 1970); State ex rel. Leighton v. Henderson, 448 S.W.2d 82, 83 (Tenn. Crim. App. 1969)). During the post-conviction hearing, post-conviction counsel and second counsel referenced the relevant portion of the voir dire transcript from the Petitioner's trial. Accordingly, we conclude that the issue was sufficiently developed during the post-conviction hearing to facilitate appellate review.

Regarding this issue, the record shows that second counsel twice objected to the State's questioning of the jury during voir dire. During the first exchange, the State asked

- 12 -

the jury, "[H]ow could you know, one hundred percent, without a doubt, that something happened or didn't happen?" Second counsel asked to approach the bench and advised the court that the State was "going to reiterate what she thinks the facts are[.]" The State countered that it was not going to do that, and second counsel explicitly stated "she's anticipating what the facts will show . . . . I would very respectfully object." Later, as reflected in the exchange read by first counsel during the post-conviction hearing, second counsel renewed his objection. Although the Petitioner argues that second counsel did not explicitly object during the State's voir dire, the record belies this claim.

Even if second counsel did not explicitly object, the Petitioner has failed to establish that a clear objection would have entitled him to relief. As an initial matter, the only proof at the evidentiary hearing on this issue was from first counsel, who testified that, although second counsel objected, first counsel did not believe the State's question was objectionable. The record also shows that each time second counsel objected during voir dire, second counsel was overruled by the trial court. The trial court specifically stated that it gave the parties "leeway" during voir dire and that it would intervene only if the State attempted to illicit a promise from the jury or attempted to inject the facts of the case. Here, the Petitioner generally argues that second counsel's failure to explicitly object to the State's inquiry about who picks the victim to a crime "undermined the presumption of innocence" afforded to the Petitioner. In support of this issue, the Petitioner relies on State v. Duffel, 631 S.W.2d 445, 447 (Tenn. Crim. App. 1981), for the proposition that prejudicial remarks during voir dire are waived for failure to object to the remarks. While we certainly agree that prejudicial remarks during voir dire are preserved only by proper objection, the Petitioner has not established, much less argued, how the State's remarks in this case were prejudicial. Evaluating the State's comments in their full context, we conclude that they were not prejudicial because they did not misstate the law, create bias, or improperly shift the burden of proof in this case. Accordingly, the Petitioner has failed to establish that the second counsel's performance during voir dire was deficient and prejudicial. He is not entitled to relief.

Next, the Petitioner claims that first counsel's cross-examination of the victim was deficient because counsel failed to impeach the victim's testimony that her "mother woke up to a text message that said did you find the condom wrapper, and I jacked off on your breasts" with the cell phone packet. The Petitioner insists the cell phone packet did not contain a text message that he "jacked off on her breasts." The State argues the Petitioner failed to include the cell phone packet in the record and thus failed to prove by clear and convincing evidence that first counsel was ineffective.

Once again, we note that this court may take judicial notice of the record of the Petitioner's direct appeal. We have reviewed the cell phone packet, which was admitted

as an exhibit at trial. The Petitioner correctly asserts that it does not contain a text message sent from the Petitioner to the victim with language that he, "jacked off on your breasts[.]" However, as explained by first counsel at the evidentiary hearing, the victim "reshaped" this text in her testimony and described it as the text in which the Petitioner talked about having her blue Calvin Klien panties. The cell phone records clearly corroborate the other aspects of the victim's testimony which included the Petitioner having the victim's "LiteBlue Calvin Klein p[anties]" and asking the victim, "Did you find a condom[.]" Significantly, first counsel was not asked at the evidentiary hearing why he did not impeach the victim with the fact that the cell phone records did not contain a text with the language "jacked off on your breasts." In our view, such impeachment would have been marginal, at best, given the overwhelming evidence of the Petitioner's guilt in this case. Miller, 2020 WL 3443021, at *5 (text messages sent to the victim provided evidence of an ongoing sexual relationship between the victim and the Petitioner). Finally, the record demonstrates that first counsel was partially successful in challenging the victim's credibility in other aspects of her testimony including the condition of the Petitioner's penis. Because the Petitioner cannot establish that the outcome of the trial would have been different had the victim been impeached with the missing language from the text message, we conclude that the Petitioner is not entitled to relief.

The Petitioner also maintains that trial counsel were ineffective in failing to "explain the pros and cons to [Petitioner] of testifying at trial" and in failing to "strongly encourage[e] him to testify at trial." The State asserts that the Petitioner waived this issue by failing to provide an adequate record and that in any case, the Petitioner failed to establish that trial counsels' advice concerning his right to testify was constitutionally deficient and prejudicial. As an initial matter, we again note that this court takes judicial notice of the trial record of a petitioner in a post-conviction proceeding. We have reviewed the record, which established that the Petitioner participated in a Momon hearing at trial and waived his right to testify. See Momon v. State, 18 S.W.3d 152 (Tenn. 1999) (adopting a prophylactic procedure designed to ensure that a defendant's waiver of the fundamental right to testify is voluntary, knowing, and intelligent). During the Momon hearing, the Petitioner agreed that he had talked with trial counsel extensively before and during trial about whether he should testify. The Petitioner also acknowledged that he was satisfied with the representation he had received. He was also advised that the trial court would instruct the jury that it could not hold the Petitioner's decision not to testify against him. Finally, we agree with the post-conviction court that the Petitioner himself testified at the evidentiary hearing that trial counsel told him he had a right to testify, that "it was up to [the Petitioner] and whatever [he] wanted to do," and that the Petitioner decided not to testify. The Petitioner said, "We went to trial, and I—we didn't—I didn't say anything. I ain't have nothin' [sic] to say. I just told them to prove it." Based on this proof, the

- 14 -

Petitioner has failed to establish trial counsels' performance on this issue was deficient and prejudicial. He is not entitled to relief.

Finally, the Petitioner argues that he is entitled to post-conviction relief under the cumulative error doctrine. Because we have determined that there was, at most, a single instance of deficient performance, the Petitioner is not entitled to relief under the cumulative error doctrine. State v. Hester, 324 S.W.3d 1, 77 (Tenn. 2010) ("To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings."); see Chandler v. State, No. M2017-01639-CCA-R3-PC, 2018 WL 2129740, at *10 (Tenn. Crim. App. May 9, 2018). Accordingly, the Petitioner is not entitled to relief.

## CONCLUSION

Based on the above reasoning and authority, we affirm the judgment of the post-conviction court.

s/ Camille R. McMullen_____
CAMILLE R. MCMULLEN, PRESIDING JUDGE